# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JAMES RYDER,

        Plaintiff,

v.                                    Case No. 18-10760

BEAUMONT HEALTH INC.,

        Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff James Ryder sues his former employer of 25 years, Defendant Beaumont Health Inc. ("Beaumont") for violations of the Americans with Disabilities Act ("ADA"), Family Medical Leave Act ("FMLA"), and the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"). Pending before the court is Beaumont's Motion for Summary Judgment. (ECF No. 48.) Ryder initially sought relief under the ADA on behalf of himself and members of a putative class. The court granted Beaumont's motion to strike the class allegations. (ECF No. 32.) The claims at issue in this motion, therefore, pertain to those alleged by Ryder in his individual capacity. The summary judgment motion has been fully briefed, and the court held argument on September 11, 2019. For the reasons explained below, as to Ryder's disability discrimination and retaliation claims, factual disputes remain which preclude summary judgment. However, the court will grant summary judgment for Beaumont on Ryder's FMLA claim.

## II. BACKGROUND

Ryder began working for Beaumont on November 30, 1992. He held various jobs during his tenure with the company. Relevant for purposes of this case, Ryder began working as a Customer Service Coordinator ("CSC") in Beaumont's Home Medical Equipment division around October 2005. (ECF No. 53-6, PageID.1826.)

### A. Beaumont's Organizational Structure and Ryder's Employment

Beaumont's Home Medical Equipment division is comprised of two different departments—retail and intake. Employees in the retail department work out of Beaumont hospitals and several free-standing stores. The primary responsibilities of retail department CSCs include filling orders for durable medical equipment, such as CPAP machines, nebulizers, crutches, and braces, fitting patients for that equipment, and demonstrating proper use. Additionally, retail department CSCs stationed in hospital stores visit patients in their rooms before discharge to assist with delivery and home set-up of medical equipment. Direct patient contact is an essential function of retail department CSCs working in hospitals and in the free-standing stores. During the time relevant to this litigation, Carrol Owens managed the retail department.

CSCs in the intake department work in a centralized call center. Unlike retail department CSCs, intake CSCs do not have direct patient contact in a hospital setting. Intake CSCs are responsible for filling orders for home medical equipment over the phone, ensuring proper documentation for insurance authorization, and scheduling appointments for patients. Melissa Avery managed the intake department.

Ryder worked primarily as a retail department CSC at Beaumont's Woodward store, which is not attached to a hospital. In 2015, he was temporarily reassigned to the

2

intake department. Many of the facts regarding this reassignment are in dispute. The parties dispute the exact length of time of Ryder's reassignment, the reasons for his reassignment, and the quality of Ryder's performance in this position. (*Compare* ECF No. 48, PageID.887–888, *with* ECF No. 53, PageID.1468–1470.) According to Ryder, he was transferred in retaliation for raising concerns about the retail department management. And according to Beaumont, Ryder was temporarily reassigned to assist with a backlog of CPAP orders. With respect to Ryder's performance during his reassignment, intake department supervisor Melissa Avery testified that Ryder struggled to take calls and process orders as efficiently as his coworkers. (ECF No. 48-4, PageID.1117–1119.) Ryder asserts that Avery's criticisms are disingenuous. He points to his consistently positive performance reviews and highlights the fact that there were no defined metrics to measure "efficiency" within the intake department. He also notes Avery's failure to document his supposedly poor performance or discuss her performance concerns with him. (ECF No. 53, PageID.1469.) Ultimately, Ryder was transferred back to the retail department. Avery testified that Ryder was transferred back because he would be "more successful" at the retail store where he already had a "fan base" of regular customers. (ECF No. 53-9, PageID.2112, 2133–2134.)

## B. Ryder's Medical Leave and Subsequent Termination

Ryder took FMLA-protected leave several times during his employment. He took leave in 2004 and again in 2010, and he returned to work without incident after both periods of absence. Relevant here, Ryder also took leave from February 24, 2016, to March 14, 2016. Later that year, he took additional leave from October 25, 2016, to November 28, 2016, for chest pain and anxiety. The parties agree that Ryder's 12

weeks of FMLA-protected leave for the rolling year expired on December 19, 2016. (ECF No. 48, PageID.892.)

Before returning to work, Ryder requested two extensions of his leave. In his first request, made on November 23, 2016, he asked to extend his leave until January 15, 2017. (ECF No. 48-21.) He then requested an additional extension until January 17, 2017. (ECF No. 48-22.) On December 16, 2016—three days before the expiration of his 12 weeks of FMLA-protected leave—Owens sent Ryder a letter informing him that she needed to fill his position upon the expiration of his 12 weeks of leave.[1]

The parties dispute whether Beaumont actually filled Ryder's position. (ECF No. 48, PageID.893; ECF No. 53, PageID.1475.) Beaumont contends that Ryder's vacant position at the Woodward store was transferred to the Troy hospital store in order to assist with increased patient volume at the Troy location and that Ali Sobh was hired as Ryder's replacement. Ryder asserts that there was no need for increased staffing at the Troy hospital store. He also argues that Ali Sobh did not actually replace him because the majority of his responsibilities involved CPAP-related work, and Sobh had no CPAP experience. It is undisputed that Ryder never asked to be placed in his former position upon his return from FMLA leave.

### C. Ryder's Lay-off Status and Job Search

Ryder was finally cleared to return to work without restrictions on January 26, 2017, having taken approximately 17 weeks of medical leave in the rolling 12-month

---

[1] Throughout his brief, Ryder places great emphasis on the fact that Owens requested this letter from Human Resource on November 23, 2016, the same day that he requested his first extension. (ECF No. 53, PageID.1474,1573.) However, he offers no evidence that such a request constitutes discrimination.

period. Upon his return from leave, he was placed on a 60-day-layoff status pursuant to

Beaumont Policy 230. The policy states in relevant part:

> If an employee returns from a Family and/or Medical leave and has
> exceeded their twelve (12) weeks of job protection within a twelve (12)
> month period or the employee is returning from a leave other than a
> Family and/or Medical leave and the employee's position is no longer
> available, he/she will be placed on an unpaid 60-day lay-off and must be
> referred to HR.
>  . . .
> If a position is not secured within sixty (60) days, or a "good faith job offer"
> is refused, the department manager should terminate the employee
> through Oracle Manager Self Service indicating "discharged lay-off."

(ECF No. 48-18, PageID.1238.)

Beaumont maintains that this 60-day-layoff status helps employees compete

for new positions as internal candidates and that it is used not only for employees

returning from FMLA leave but also for employees who lose required job credentials or

mutually decide with management to leave their current positions based on poor fit.

Beaumont's internal applicant hiring system marks which applicants are on layoff status,

but the system does not specify the reason for an employee's placement on layoff

status.

When Ryder was placed on layoff status, he met with Human Resources

Director Dianne Beloungea who explained that he would be terminated if he failed to

accept a position at Beaumont within 60 days. During this meeting, Beaumont alleges

that Beloungea offered Ryder a contingent position as a CSC in the retail division in lieu

of going on layoff status. Ryder denies that this offer was made but insists that he would

have declined it regardless because working as a contingent employee would strip him

of the seniority and benefits he accumulated during his 25-year tenure with Beaumont.

Ryder applied for 18 open jobs while on layoff status. He interviewed for four positions and received one job offer. The parties dispute whether Ryder declined his sole offer or if he requested an accommodation for the position. The positions for which Ryder applied are discussed below.

### 1. Royal Oak Hospital CSC Position and Notification of Disability

On February 27, 2017, Ryder was offered a CSC position in the retail department at Beaumont's Royal Oak hospital. Ryder learned of this job offer while en route to the hospital for medical treatment. He was hospitalized for several days. During this time, he learned that he suffered from a rare genetic disorder, Common Variable Immune Deficiency, which compromised his immune system. His doctor advised him that he could not work in a hospital or clinic environment which required daily patient contact.

On March 2, 2017, Ryder's spouse faxed a letter from Ryder's treating physician to Beaumont's human resources department. The letter explained Ryder's diagnosis and restrictions. The letter also stated that:

> [E]mployment in a hospital or clinic environment with its high rate of exposure to infections by daily patient contract would jeopardize the health of my patient, James Barclay Ryder. Employment in this type of environment needs to be avoided at all costs. As his doctor, I cannot recommend nor would I support that Mr. Ryder take such a position of employment.

(ECF No. 48-31, PageID.1303.)

On March 7, 2017, Ryder's spouse—at Ryder's request and on his behalf—emailed Beaumont's employment representative for the Royal Oak CSC position and explained that Ryder could not accept the position because he could not work in a hospital. The email stated:

Per Dr. Talbert's letter, which I faxed to you last Thursday night, employment in one of Beaumont Health's hospitals or clinics "with its high rate of exposure to infections by daily patient contact would jeopardize the health" of Jim. Under these circumstances, the proposed offer is not possible.

As I mentioned to you last Thursday when we spoke, Jim is able and willing to accept other Beaumont Health positions for which he has applied or is eligible with the accommodation that it is not a position within a hospital or clinic environment requiring daily patient contact.

(ECF No. 48-31, PageID.1298.)

Ryder argues that the March 2nd fax and the March 7th email constitute requests for an accommodation. (ECF No. 53, PageID.1480.) Beaumont characterizes these communications as Ryder's rejection of the Royal Oak CSC position.

## 2. Troy Hospital CSC Position

Ryder applied to another hospital-based CSC position before learning of his disability. According to Beaumont, he was not selected for the Troy CSC position because the restrictions imposed by his doctor would prevent him from performing an essential duty of the function—directly interacting with patients in hospital rooms. Ryder argues that this position could have been tailored to accommodate his disability if it was transferred to a non-hospital location. He asserts that the CSC positions are interchangeable between location and points to the fact that some hospital-based CSCs were scheduled to work at the freestanding Woodward store, not the Troy hospital. (ECF No. 53, PageID.1498; ECF No. 53-14, PageID.2358.) Ryder never suggested to Beaumont the possibility of transferring the open position to different locations.

## 3. Intake Division Positions

On February 10 and 17, 2017, Ryder applied for two CSC positions in the intake department at Madison Heights. The supervisor of the intake department,

Melissa Avery, admits that Ryder was qualified for these positions "on paper" but testified that she declined to interview him because she was advised by human resources that Ryder had already been offered another position. (ECF No. 48-4, PageID.1125.) She testified that these positions were filled before she learned of Ryder's disability; however, evidence shows that job offers for these positions were not extended until March 8, 2017, and March 15, 2017—*after* Beaumont was notified of Ryder's disability via the March 2, 2017 fax and March 7, 2017 email. (ECF No. 53–24, PageID.2474, 2493.) The record is not clear when applicants for these positions were interviewed or the precise date on which management selected the candidates to hire.

Avery also testified that Ryder "wasn't the best fit" for the intake CSC positions based on his performance during his temporary reassignment to the intake department in 2015. (ECF No. 48-4, PageID.1120–1121.) As explained above, Ryder maintains that Avery's negative comments about his performance are disingenuous. *See supra* Part II.A.

### 4. Assistance from Human Resources Officers

On March 16, 2017, Ryder emailed Paul Conway, Chief of Human Resources, and expressed his frustration about securing employment. Ryder also asked for Conway's assistance finding a job that would accommodate his disability. (ECF No. 48-49.) The next day, Conway assigned the Director of Human Resources, Mark Ahlquist, to assist Ryder in his job search. Ryder spoke with Ahlquist on March 27, 2017. During this call, Ryder asked for an extension of his 60-day-layoff period so that he could apply for more jobs. Beaumont views Ryder's request for additional time to apply for jobs to be his *only* request for accommodation. (ECF No. 48, PageID.921.) Ryder also asked

for Ahlquist's assistance in securing a position as a sleep study specialist, a position for which he had applied. Ahlquist granted both requests.

Ahlquist personally sponsored Ryder's application for a position as a sleep study specialist; however, he was not offered the job. (ECF No. 53-5, PageID.1759.) Ahlquist testified that he held periodic phone calls with Human Resources Director Dianne Beloungea to discuss Ryder's job search, and the evidence shows that Beloungea also assisted in Ryder's employment search. Specifically, Beloungea sponsored Ryder for a documentation coordinator position, although he was not offered the job. According to the interviewer for the documentation coordinator position, Ryder spoke negatively about Beaumont and incorrectly answered technical questions during the interview. (ECF No. 48-9, PageID.1174, 1177.) Additionally, Ryder interviewed for a patient registration CSC position for which he applied at the request of Beloungea. (ECF No. 48-7, PageID.1156–1157.) The hiring manager for this position, Linda Flower, testified that she did not hire Ryder because he exhibited a "negative" and "domineering" attitude during the interview. (ECF No. 48-7, PageID.1158, 1159, 1160–1161.) Fowler was also the hiring manager for another patient registration CSC position for which Ryder applied in May 2017. He was not offered an interview for that position.

### 5. Other Positions and Termination

Ryder applied to 8 other positions during his layoff status. He was not extended a job offer for any of these positions. Ryder concedes that for these remaining positions, he was less qualified than the individuals ultimately selected. (ECF No. 48, PageID.902, 906–912; ECF No. 53-5, PageID.1818–1819.)

Ryder last applied to a position with Beaumont on May 4, 2017. (ECF No. 48-29.) He was terminated on June 14, 2017, after he failed to accept an offer during his layoff period. This suit followed.

### III. STANDARD

Summary judgment is appropriate when there exists no dispute of material fact and the moving party demonstrates entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the court considers all evidence, and all reasonable inferences flowing therefrom, in the light most favorable to the nonmoving party. *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). The court may not make credibility determinations or weigh the evidence presented in support or opposition to a motion for summary judgment, only the finder of fact can make such determinations. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

The movant has the initial burden of showing—pointing out—the absence of a genuine dispute as to any material fact; i.e., "an absence of evidence to support the nonmoving party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). The burden then shifts to the nonmoving party to set forth enough admissible evidence to raise a genuine issue of material fact for trial. *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248; *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017). Not all factual disputes are material. A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim "and

would affect the application of the governing law to the rights of the parties." *Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013).

## IV. DISCUSSION

## A. FMLA Retaliation Claim

Ryder asserts one claim under the FMLA for retaliation.[2] (ECF No. 53, PageID.1507.) The FMLA entitles employees to take leave for "serious health condition[s]" and prohibits employers from considering an employee taking FMLA leave as a negative factor in deciding employment benefits. 29 U.S.C. §§ 2612, 2614. "Qualifying employees who return to work within that 12–week period are entitled to be reinstated to their previous position, or 'to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.'" *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 506 (6th Cir. 2006) (quoting 29 U.S.C. § 2614(a)(1)). But the protections of the FMLA are not indefinite in duration. "Once the 12-week period ends, however, employees who remain 'unable to perform an essential function of the position because of a physical or mental condition . . . [have] no right to restoration to another position under the FMLA.'" *Edgar*, 443 F.3d at 506 (alteration in original) (quoting 29 C.F.R. § 825.216(c)); *see also Coker v. McFaul*, 247 F. App'x 609, 620 (6th Cir. 2007) ("Once an employee exceeds his twelve work weeks . . . of FMLA leave, additional leave in the twelve month period is not protected by the FMLA, and termination of the employee will not violate the FMLA.") (quoting *Manns v. ArvinMeritor, Inc.*, 291 F. Supp. 2d 655, 660 (N.D. Ohio 2003)); *Hicks v. Leroy's Jewelers, Inc.*, 225

---

[2] The amended complaint states claims for both retaliation and interference under the FMLA. However, Ryder defends the motion for summary judgment on the sole theory of retaliation.

F.3d 659 (6th Cir. Jul. 17, 2000) (table opinion) (per curiam) ("[A]n employee on approved FMLA leave has no right to job restoration under the Act if she fails to return to work twelve weeks after her leave began.").

To establish a claim for retaliation under the FMLA, Ryder must show that: "(1) he was engaged in a statutorily protected activity; (2) [Beaumont] knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012). Beaumont is entitled to summary judgment on the FMLA claim because Ryder was not engaged in protected leave at the time of the adverse employment action alleged.

Ryder argues that Beaumont violated the FMLA by filling his position before the expiration of his protected leave. Beaumont claims it replaced Ryder with Ali Sohb. Ryder disputes this stating that Sohb did not have the skills necessary to perform his position and, therefore, was not actually hired to replace him but only as an additional employee. Ryder contends that Beaumont never actually replaced him. (ECF No. 53, PageID.1475.) This dispute is not material because Ryder could not return to work until approximately five weeks after he exhausted his FMLA leave. Thus, once Ryder failed to return to work after using his full 12 weeks of leave, Beaumont was within its authority to terminate his position, even if it elected not to fill his position. *See Edgar*, 443 F.3d at 506; *Coker*, 247 F. App'x at 620. The court will grant summary judgment to Beaumont for the FMLA claim.

## B. ADA and PWDCRA Claims

In the amended complaint, Ryder asserts claims for disability discrimination, retaliation, and failure to accommodate under the ADA and PWDCRA.[3]

### 1. Discrimination Claims

Ryder applied to a total of 18 jobs while on layoff status; however, his arguments focus on the CSC positions for which he applied. First, Ryder argues that Beaumont discriminated against him by terminating his job offer for the Royal Oak CSC position after receiving his requests for accommodation on March 2, 2017, and March 7, 2017. Second, he asserts that Beaumont failed to accommodate his disability for any of the CSC positions to which he applied. (ECF No. 53, PageID.1509–1510.) In response, Beaumont argues that Ryder rejected the Royal Oak CSC position and never requested an accommodation for the hospital-based CSC positions. (ECF No. 54, PageID.3085.) Beaumont also asserts that Ryder was not qualified for the two intake CSC positions based on his past performance in the intake department and that the positions were filled by the time Beaumont learned of his disability.

The ADA states that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Generally, there are two ways to prove disability discrimination—either directly or

---

[3] The court will analyze the ADA and PWDCRA claims in tandem because the statutes "substantially" mirror eachother. *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs.*, 287 F.3d 593 (6th Cir. 2002) (abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) (en banc))).

indirectly." *Booth v. Nissan N. Am., Inc.*, 927 F.3d 387, 395 (6th Cir. 2019). Ryder

argues that both direct and indirect evidence support his discrimination claims.

**a. Direct Evidence of Discrimination**

Discrimination claims based on the failure to accommodate a disability

necessarily involve direct evidence of discrimination. *See Brumley v. UPS*, 909 F.3d

834, 839 (6th Cir. 2018) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–

69 (6th Cir. 2007)). Direct evidence of discrimination is that which "does not require a

factfinder to draw any inferences in order to conclude that the challenged employment

action was motivated at least in part by prejudice against members of the protected

group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (discussing direct

evidence in a racial discrimination case). Cases involving direct evidence are rare

because "because employers generally do not announce that they are acting on

prohibited grounds." *See Erwin v. Potter*, 79 F. App'x 893, 897 (6th Cir. 2003); *see also*

*Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) ("Such [direct] evidence

would take the form, for example, of an employer telling an employee, 'I fired you

because you are disabled.'").

Ryder proffers no direct evidence of discrimination. He argues that statements

made by Human Resources Director Dianne Beloungea constitute direct evidence of

discrimination, but he is mistaken. (ECF No. 53, PageID.1502.) During her deposition,

Beloungea responded to a question posed by counsel regarding Beaumont's

procedures for placing employees whose disabilities prevent them from performing an

essential function of their former jobs—the question did not address how Beaumont

generally handles requests for accommodation. (ECF No 53-25, PageID.2564–2565.)

Ryder ignores this important distinction as he cites the testimony for his conclusion that Beaumont "does not accommodate employees with disabilities." (ECF No. 53, PageID.1502.) Beloungea's testimony about hypothetical employees whose disabilities cannot be reasonably accommodated—and which did not so much as allude to Ryder—is not direct evidence of discrimination in this case. Accordingly, Ryder's claims must be analyzed under the indirect evidence standard.

**b. Indirect Evidence of Discrimination**

The court applies the familiar burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972) to Ryder's discrimination claim based on indirect evidence. *See Hedrick v. Western Reserve Care System*, 355 F.3d 444, 453 (6th Cir. 2004) (applying burden-shifting framework). Under this framework, the plaintiff must first establish a prima facia case of discrimination by showing that:

> (1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Hummel v. Cty. of Saginaw*, 40 F. App'x 965, 968 (6th Cir. 2002*) (quoting *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.,* 155 F.3d 775, 779 (6th Cir. 1998)). Next, the burden shifts to the employer to provide a non-discriminatory reason for the adverse employment decision alleged. *Id.* Finally, if the employer offers a legitimate explanation for the action, the burden shifts back to the employee to show that the proffered explanation is pretext for discrimination. *Id.* "An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually

motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805–06 (6th Cir. 1998).

The parties' dispute centers on the second element, *i.e.*, whether Ryder was qualified for the positions to which he applied.[4]

*i. Royal Oak and Troy Hospital CSC Positions*

Ryder first argues that Beaumont discriminated against him by failing to "honor its offer" to hire him for the Royal Oak CSC position. (ECF No. 53, PageID.1518–1519.) Beaumont responds that Ryder rejected the job offer in the March 7, 2017 email.

Indeed, in his March 7th email, Ryder's spouse specifically rejected the Royal Oak CSC position Ryder had been offered: "[E]mployment in one of Beaumont Health's hospitals or clinics 'with its high rate of exposure to infections by daily patient contact would jeopardize the health' of Jim. *Under these circumstances, the proposed offer is not possible.*"(ECF No. 48-31, PageID.1298 (emphasis added).) The same email also stated that Ryder was "able and willing to accept *other* Beaumont Health positions for which he has applied." (ECF No. 48-31, PageID.1298 (emphasis added).) The use of the word "other" in this email shows a clear indication that Ryder rejected the Royal Oak CSC position, but requested an accommodation for *other* positions to which he applied. No reasonable juror could interpret the email as asking for an accommodation for the Royal Oak job. In fact, Ryder testified that it was "impossible" for him to accept the Royal Oak position and that no accommodation existed for this position. (ECF No. 48-2,

---

[4] Ryder's arguments relate only to the CSC positions to which he applied. The court's analysis considers the positions which Ryder addresses in his response.

16

PageID.1011–1012.) Thus, Beaumont did not discriminate against Ryder in failing to hire him for a position he had rejected.

Next, Ryder challenges Beaumont's failure to hire him for the Troy hospital CSC retail opening and failure to provide an accommodation for either the Royal Oak and Troy hospital CSC positions. He argues that a reasonable accommodation existed for these positions—transferring the positions to non-hospital locations. Ryder claims that this proposed accommodation is reasonable because CSC positions "shared one job description and CSCs were regularly scheduled irrespective of their primary assignments to specific retail locations or to Intake." (ECF No. 53, PageID.1520.) In support, Ryder highlights portions of Beaumont's CSC schedule in which it appears that CSCs worked at locations other than their primary duty posts. (ECF No. 53, PageID.1496–1497.) Beaumont responds that this accommodation was not reasonable and, irrespective of its feasibility, that Ryder never proposed transferring the positions to different locations.

"The reasonableness of an accommodation is a fact issue." *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998). The ADA defines "reasonable accommodation" to include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). Under this definition, the creation of new jobs or the displacement of other employees is not a reasonable accommodation. *See Thompson v. E.I. DuPont*

*deNemours & Co.*, 70 F. App'x 332, 338 (6th Cir. 2003) ("The court found that an employer is not required to create a new job in order to reassign a disabled employee.").

The court need not resolve the issue of whether transferring the open CSC positions was reasonable because Ryder never suggested this course of action prior to his termination. The Sixth Circuit has explained that "although employers have a duty to locate suitable positions for disabled employees, such employees may not recover unless they propose, or apply for, particular alternative positions for which they are qualified." *Burns v. Coca-Cola Enters.*, 222 F.3d 247, 258 (6th Cir. 2000). During Ryder's layoff, Beaumont had no posted openings for CSC positions at non-hospital locations. Ryder applied to two hospital-based CSC positions for which, he acknowledges, there existed no suitable disability accommodation. Although he asked for assistance locating a position outside of a hospital setting in his early March communications, Ryder never asked Beaumont to transfer the open Royal Oak or Troy hospital CSC positions to non-hospital locations, nor did he propose resuming his previous position at the Woodward store. Beaumont cannot be criticized for failing to consider a request that Ryder never proposed. *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 983 (6th Cir. 2011) ("The employee also bears the burden of proposing reasonable accommodations; an employee's claim must be dismissed if the employee fails to identify and request such reasonable accommodations.").

While Beaumont cannot be liable for failing to transfer open positions to different locations, Ryder has presented sufficient evidence to create a triable issue regarding the intake department CSC positions for which he applied.

18

*ii. Intake Department CSC Positions*

The parties agree that CSCs in the intake department do not have direct patient contact in a hospital setting. Ryder applied to two intake CSC positions during his layoff status but was not considered for either opening. The parties dispute the reasons why Ryder was not considered. Beaumont contends that it declined to interview Ryder for the positions because Ryder had been offered the Royal Oak CSC position and also because Ryder performed poorly during his temporary reassignment to the intake department in 2015. Ryder has presented sufficient evidence for a reasonable juror to find that both of Beaumont's cited justifications are pretextual.

At this stage in the case, it is not clear when management selected the candidates to fill the intake positions compared to when Beaumont learned of Ryder's disability and his limitations. Avery testified that she filled the positions before learning about Ryder's disability and need for accommodation, but job offers for these two positions were not extended until after Ryder contacted Beaumont human resources on March 2, 2017, and March 7, 2017. As explained more fully in the next section, both of these communications describe Ryder's disability and request an accommodation outside of a hospital setting. At trial, Beaumont may be able to present a legitimate explanation for why the offers were extended to other applicants after it learned of Ryder's disability, but that evidence is not before the court at this time. Drawing all reasonable inferences in Ryder's favor, he has presented sufficient evidence for a reasonable juror to find that Beaumont ignored his early March communications and failed to consider him for two open positions that would have accommodated his disability.

Ryder has also presented evidence sufficient for a jury to find that Beaumont's performance concerns are pretext for not considering him for the intake positions. Avery testified that she expressed concerns about Ryder's performance. However, Ryder points to his positive performance reviews and lack of management's contemporaneous documentation to suggest poor performance. A jury must decide the appropriate weight to give this competing evidence. *See Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 591–92 (6th Cir. 2002) (accepting as evidence of pretext plaintiff's continued receipt of performance based-bonuses despite the employer's stated dissatisfaction with the employee's performance.) A jury must resolve the parties' competing evidence regarding Ryder's qualifications for the intake CSC positions and whether the positions were still available when Ryder made known to Beaumont his inability to work in a hospital setting.

### 2. Retaliation Claim

Ryder alleges that he was retaliated against by "ignoring his written request for an accommodation, refusing to consider him for the two Intake positions, and failing to reassign the CSC slot it had offered him to the Woodward retail position." (ECF No. 53, PageID.1510.)

The *McDonnell Douglas* burden-shifting framework governs retaliation claims under the ADA. *Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 384 (6th Cir. 2017). The elements of a prima facia ADA retaliation claim are: "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the

protected activity and the adverse action." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). "Establishing a prima facie case of retaliation is a 'low hurdle.'" *Id.*

Beaumont's failure to reassign the Royal Oak CSC position offered to Ryder does not constitute adverse action because Beaumont cannot be held liable for failing to provide an accommodation that Ryder did not request or for failing to create a new job for Ryder. *See Johnson*, 443 F. App'x at 983; *Burns*, 222 F.3d at 258. As the court explained in its May 3, 2019 order, the ADA does not require preferential treatment for individuals with disabilities and does not require employers to place employees in positions for which they did not apply. *See Burns*, 222 F.3d at 258 ("Allowing Burns to recover despite his failure to abide by KCC's non-discriminatory policy requiring him to apply for a transfer to a new position within his restrictions would convert a nondiscrimination statute into a mandatory preference statute, a result which would be inconsistent with the nondiscriminatory aims of the ADA."). But, as noted above, issues of material fact remain regarding the two other retaliatory actions alleged by Ryder; ignoring his request for accommodation and failing to consider him for the intake CSC positions.

Ryder's communications with Beaumont in early March 2017 constitute protected activity—requests for accommodation. Beaumont knew of this activity because it received Ryder's requests. Requests for accommodation can take a variety of forms:

> Our case law establishes no bright-line test for when the form of an employee's request is sufficiently clear to constitute a request for an accommodation. On one hand, we have held that the ADA does not require employees to "use the magic words 'accommodation' or even 'disability.'" *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007). On the other hand, "[t]he employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Gantt*, 143 F.3d at 1046–47. The employee also must

> make it clear that the request is being made because of the employee's
> disability. *Leeds*, 249 F. App'x at 449.

*Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 410 (6th Cir. 2014). "In certain

situations, a request for accommodation can be inferred by context." *Aldini v. Kroger*

*Co. of Michigan*, 628 F. App'x 347, 350–51 (6th Cir. 2015). Simply notifying an employer

of a plaintiff's disability is insufficient to sustain a discrimination claim. A plaintiff must

also describe the limits of the disability and, if appropriate, request a specific

accommodation. *See Lorubbio v. Ohio Dep't of Transp.*, 181 F.3d 102 (6th Cir. 1999)

(citing *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998)).

Although the March 2, 2017 fax from Ryder's treating physician does not "use the

magic word accommodation," *Judge*, 592 F. App'x at 410 (internal quotations omitted),

it describes Ryder's disability and specifically states that Ryder's disability prohibits him

from accepting a position in a "hospital or clinic environment." (ECF No. 48-32,

PageID.1303.) Notes from a plaintiff's doctor can constitute requests for

accommodation. *See, e.g.*, *Mobley v. Miami Valley Hosp.*, 603 F. App'x 405, 410 n.4

(6th Cir. 2015) (construing as a request for accommodation a note sent by the plaintiff's

doctor); *Reeder v. Cty. of Wayne*, 177 F. Supp. 3d 1059, 1078 (E.D. Mich. 2016) (Drain,

J.) (considering the plaintiff's "numerous doctors' notes, listing restrictions" and verbal

discussions with the defendant regarding plaintiff's medical condition and its limitations

to be requests for accommodation); *Hardenburg v. Dunham's Athleisure Corp.*, 963 F.

Supp. 2d 693, 705 (E.D. Mich. 2013) (Zatkoff, J.) ("[T]he Court will draw all reasonable

inferences in favor of Plaintiff and concludes that when Plaintiff presented his doctor's

note to Defendant—after the stroke and upon returning to work—such action constituted

a request for accommodation."); *Weber v. Infinity Broad. Corp.*, No. 02-74602, 2005 WL

3726303, at *3 (E.D. Mich. Dec. 14, 2005) (Steeh, J.) (construing a doctor's note stating

that plaintiff should not be exposed to a coworker's perfume as a request for

accommodation); *Moore v. Marriott Int'l Inc.*, No. 12-00770, 2014 WL 5581046, at *2 (D.

Ariz. Oct. 31, 2014) (construing a physician's note asking plaintiff to be excused from

working with certain materials to be request for accommodation); *Kovac v. Lowe's*

*Home Ctrs., Inc.*, No. 05-2276, 2006 WL 1644336, at *1 (N.D. Ohio June 7, 2006)

(considering a physician's note describing that plaintiff would have "permanent work

restrictions of primarily sedentary type of activities" to be a request for accommodation).

Thus, the March 2, 2017 fax from Ryder's doctor is sufficiently specific to constitute a

request for an accommodation for a position outside of a hospital or clinic location.

Moreover, the March 7, 2017 email sent by Ryder's spouse, acting on his

behalf, also constitutes a request for accommodation:

> As I mentioned to you last Thursday when we spoke, Jim is able and
> willing to accept other Beaumont Health positions for which he has applied
> *or is eligible with the accommodation that it is not a position within a*
> *hospital or clinic environment requiring daily patient contact*.

(ECF No. 53-30, PageID.2759 (emphasis added).)

The email clearly communicates Ryder's disability and relays the limitations

imposed by Ryder's doctor based on his disability.[5] Beaumont's receipt of these

communications triggered its obligation to engage in an interactive process to find a

suitable position outside of "a hospital or clinic environment requiring daily patient

---

[5] Persuasive precedent suggests that other individuals, *e.g.,* a spouse, can make
ADA requests for accommodation on behalf of a disabled employee. *See Taylor v.
Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) (citing EEOC Compliance
Manual, Enforcement Guidance for Psychiatric Disabilities, at 20–21); *Bultemeyer v.
Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996).

contact." (ECF No. 53-30, PageID.2759); *see also* 29 C.F.R. § 1630.2(o)(3); *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 516 (6th Cir. 2015) (explaining that the ADA's interactive process is triggered once the defendant becomes aware of the plaintiff's request for accommodation.).

Beaumont concedes that it did not view Ryder's communications in early March as requests for accommodation. Although Beaumont describes the actions it took after Ryder spoke with Alquist in late March, *see supra* Part II.C.4, it is not clear what actions, if any, Beaumont undertook in response to Ryder's request for placement outside of a hospital setting based on the March 2nd fax and March 7th email. Therefore, Beaumont is not entitled to summary judgment because a reasonable jury could find that Beaumont ignored Ryder's requests based, in part, on discriminatory animus.

Additionally, the same disputes of material fact that preclude summary judgment on the discrimination claim based on the intake CSC positions also preclude summary judgment for Ryder's retaliation claim. A jury must resolve the conflicting evidence as to Ryder's qualifications for the CSC intake positions and Beaumont's hiring considerations for these positions.

## V. CONCLUSION

Beaumont is entitled to summary judgment on the FMLA claim because Ryder could not return to work after he exhausted his statutorily protected leave. Ryder is not entitled to an accommodation which he never requested, and he is also not entitled to the creation of a new position as an accommodation. However, taking the facts in the light most favorable to Ryder, in early March, he requested an accommodation for placement outside of a hospital setting and applied for two positions—the Madison

Heights intake department CSC positions—that would accommodate this request. Ryder was not considered for either intake position, and he has presented sufficient evidence for a reasonable jury to find that Beaumont's failure to consider him for these positions was motivated, in part, by his disability and request for accommodation. A jury must resolve the remaining questions of material fact regarding whether Beaumont took appropriate action in response to learning about the limitations imposed by Ryder's disability and whether Beaumont had legitimate non-discriminatory business reasons for passing over Ryder for the vacant intake CSC positions for which he applied.

Accordingly,

IT IS ORDERED that Beaumont's Motion for Summary Judgment (ECF No. 48) is GRANTED IN PART AND DENIED IN PART. It is GRANTED as to the FMLA claim. IT IS DENIED as to the discrimination and retaliation claims under the ADA and PWDCRA.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  October 9, 2019

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, October 9, 2019, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C1 ORDERS\18-10760.RYDER.FMLA.ADA.msj.HEK.4.RHC.2.docx